UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MARY MARTIN, in her capacity as | ) | |
| Personal Representative of the Estate of | ) | |
| Joseph Hayes, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 04-124-B-W |
| | ) | |
| SOMERSET COUNTY, et al., | ) | |
| | ) | |
| Defendants | ) | |

### *RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT*

On July 27, 2002, Joseph Hayes committed suicide in his cell at the Somerset County Jail by hanging himself with a sheet. His mother, Mary Martin, as personal representative of Hayes's estate, is suing Somerset County, Sheriff Barry Delong, and correctional officers John Davis, Frederick Hartley, and Daniel Rivard. Martin claims that Davis and Hartley were deliberately indifferent to the risk that Hayes might attempt to take his own life and that Rivard and Davis did not provide adequate post-hanging emergency care to Hayes. In addition to his constitutional claims Martin pled a count under the Americans with Disability Act, a count under the Maine Tort Claims Act, a wrongful death count, and a 'count' seeking punitive damages. The defendants have moved for summary judgment. (Docket No. 16.) In response, Martin concedes to judgment for the defendants on her count under the Americans with Disability Act and her count under the Maine Tort Claims Act as against Somerset County and Sheriff Delong. I now address the claims in contention.

### *Discussion*

### *Summary Judgment Standard*

The defendants are entitled to a favorable summary judgment ruling only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to District of Maine Local Rule 56, the record is not an open book. Rather, the Court's consideration of record materials is limited by the parties' statements of material facts that are both material to the dispute and supported by citation to the record. See D. Me. Loc. R. 56 ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."). In evaluating whether a genuine issue is raised, the Court must view all facts in the light most favorable to Martin and give her the benefit of all reasonable inferences. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

### *Facts*

On July 27, 2002, at approximately 3:43 p.m., Joseph Hayes, an inmate at the Somerset County Jail, was discovered hanging in the holding cell, having apparently attempted suicide using a sheet and tying it around a horizontal bar which crossed the window in his holding cell.  (Defs.' SMF ¶ 41; Pl.'s Resp. SMF ¶ 41.)  It was Sergeant Hartley who found inmate Joseph Hayes hanging. (Defs.' SMF ¶ 43.)

Eleven days earlier, on July 16, 2002, Joseph Hayes was arrested on a probation hold and brought to the Somerset County Jail.  (Defs.' SMF ¶ 1.)  During the booking interview, Hayes identified past suicide attempts.  (Id. ¶ 2; Pl.'s Resp. SMF ¶ 2.)  Mary

Martin, Hayes's mother, contacted the jail shortly after his arrival and indicated that Hayes could be suicidal. (Defs.' SMF ¶ 3.)[1]   As a result of the information provided by Hayes and his mother, on July 17, 2002, Kennebec Somerset Crisis Response Services was called to the Somerset County Jail to interview Hayes. (Id. ¶ 4.)  The interview was conducted sometime between 6:17 and 7:37 p.m. by case worker Deborah Walsh who reported that Hayes had a history of depression. (Defs.' SMF ¶ 5; Pl.'s Resp. SMF ¶ 5.) Hayes also told Walsh that he could be suicidal, but was not at that time, and indicated that he would not hurt himself in jail. Walsh advised that Hayes should be kept on a suicide prevention protocol until Hayes was not suicidal at all. (Defs.' SMF ¶ 6; Pl.'s SAMF ¶ 9.)

---

[1]   As an example of one of many frustrating entries in this summary judgment record, plaintiff responds to this straightforward record supported assertion with a denial and the following entry:

> Paragraph 3 is denied. Mary Martin, Joseph Hayes' mother, contacted the jail on the day of his arrival and told Sergeant Darlene Bug[b]ee that Hayes "is suicidal." *Jail Control Log (12:00 am July 16 through 12:00 pm July 27, 2002) identified as Exhibit 23 to Deposition of Daniel Rivard and attached hereto as Exhibit 3.*

Plaintiff's record support for this denial, Exhibit 3, consists of Bates stamped numbers D001558 to D001611. Each of those 53 pages is filled top to bottom with jail log entries. The entries actually begin on July 14, 2002. On the document Bates stamped D001571 I finally located an entry at 01:51 that reads "Inmate Hayes mother called said he is suicidal we put close watch on him he is sleeping in the hold cell at this time."   At best the cited entry is a semantic qualification of the defendants' material statement of undisputed fact. How and why Sergeant Darlene Bugbee is implicated in this factual qualification remains a mystery based upon these record citations because the initials by the entry are "CC."  I did note an entry on the same page at an unspecified time that Bugbee came on duty. The time is unspecified because there was a hole punch through the entry obliterating it. If the entry regarding Bugbee is material, its materiality has been lost on me. Bugbee's own affidavit, submitted as Defendants' Exhibit 4 and filed in support of the defendants' statement of material fact, says in paragraph 2 that she received the telephone call from Hayes's mother who indicated "that he was possibly suicidal."

Then, to make matters even more confusing, plaintiff's separate statement of material facts, paragraph 4 states, "approximately two hours after his admission, at 1:51 a.m. on July 17, 2002, Joseph Hayes' mother called the jail, spoke with Sergeant Bugbee and indicated that Hayes <u>could</u> <u>be</u> suicidal." Here Martin cites to another exhibit, the "Pass on log," Plaintiff's Exhibit 6, which indeed uses the "could be" language. It is absolutely clear on this record that shortly after Hayes's arrival at the jail Hayes's mother called the jail and alerted the correctional staff to the fact that her son could be suicidal. Why in heaven's name this fact was denied when defendants included that obviously undisputed material fact in their recitation of facts is simply incomprehensible to me.

Between July 17 and July 19, 2002, Hayes was kept in the holding cell area of the Somerset County Jail. (Defs.' SMF ¶ 7.)  Cell block assignment sheets kept at the jail indicate that during that time Hayes was on "close watch."  (Pl.'s Resp. SMF ¶ 7.)

Sometime between 1:00 and 1:30 p.m. on July 19, 2002, Kennebec Somerset Crisis Response Services was called back to the jail to evaluate Hayes a second time. (Defs.' SMF ¶ 8.)  Hayes advised the crisis worker, Astrid Redmonet, that he had attempted to hang himself with a blanket the previous night. Hayes further stated to the crisis worker that he did not want to return to general population, that he gets suicidal when stressed out, and that returning to the jail population stresses him out.  Hayes said that his "nerves were shot."  (Defs.' SMF ¶ 9; Pl.'s Resp. SMF ¶ 9.)  Hayes also told Redmonet that it was "better to be dead than alive" and that his suicide attempt had been interrupted by a loud noise.  He told Redmonet that he tied one end of a blanket around the bar to the jail window and the other end to his neck.  He then sat on top of the bunk bed contemplating jumping off, but then heard the loud noise and did not jump off the bunk. (Pl.'s Resp. SMF ¶ 10; Pl.'s SAMF ¶ 12.)  Redmonet's suggestions on July 19, 2002, were that Hayes was to be kept on a twenty-four-hour suicide watch with periodic face-to-face checks.  Further, Hayes was to be moved to a cell with twenty-four- hour 360º camera observation.  Hayes was also to be presented to the hospital, have medical checks done by the physician assistant, and should see jail social worker Bart Marks if he remained in the jail as a result of a hospital bed not being found.  (Defs.' SMF ¶ 10.)

Based upon Redmonet's recommendations, Hayes was kept safe and the following day, July 20, 2002, a blue paper was filled out by jail personnel requesting

hospitalization for Hayes in a psychiatric ward.  (Defs.' SMF ¶ 11)[2]   In this application

for emergency involuntary admission, a registered nurse stated that Hayes should be

admitted on an involuntary basis because she believed Hayes had a mental illness, posed

a likelihood of serious harm, that he possessed suicidal ideation secondary to being in

jail, and was feeling hopeless and helpless.  (Pl.'s SAMF ¶ 14.)  The application was

never completed or subjected to judicial review and endorsement.  (Id. ¶ 13.)  However,

on July 20 at 9:27 p.m. Hayes was transferred to Spring Harbor Hospital.  (Id. ¶ 15.)  He

was accepted at the hospital for psychiatric care related to his diagnosis as being acutely

suicidal. Hayes was referred to Spring Harbor for evaluation of depression and possible

psychotic symptoms.  (Defs.' SMF ¶ 11.)  By history, Hayes told the treating physician at

Spring Harbor, William Brennan, M.D., that he had tried to hang himself in the jail

earlier in the day, but this had not been witnessed.  (Id. ¶ 12.)  Hayes also told Dr.

Brennan that he had attempted suicide in the past.  (Id. ¶ 13.)  The treatment course at

Spring Harbor for Hayes was to initiate anti-depressant therapy with the medicine

Effexor.  (Id. ¶ 14.)  During the time period Joseph Hayes was at Spring Harbor, the

standard procedure was for a new admission to be on a fifteen minute observation

schedule. (Brennan Tr. at 11.)

    Hayes was at Spring Harbor from July 21 to July 23, 2002. Over the course of his

hospitalization, Hayes showed a very rapid return to symptoms of euthymia. "Euthymia

is a clinical term referring to a normal state." (Id. at 8-9.) When Dr. Brennan met with

Hayes on July 22, 2002, he observed that Hayes's mood was "better" and his affect was

---

[2]      Martin denies this statement and says that while an application for emergency involuntary
admission was filled out, the application never received an endorsement from a judicial officer.  The denial
is really a qualification, if anything, because the defendants' statement of fact does not state that he was
ordered committed by a judicial officer and the very exhibit cited by plaintiff establishes that a "blue paper
was filled out" requesting hospitalization.

bright. Hayes's thoughts were relevant and he denied suicidal or homicidal ideation. (Defs.' SMF ¶ 17.)  Brennan met with Hayes on July 23, 2002, and discussed Hayes's return to the Somerset County Jail in response to Hayes's expressed concern that he get on with his sentence and with his life when he was discharged from jail, which required that he return to the jail. (DSMF ¶ 18; Pl.'s Resp. SMF ¶ 18.)  At the time of Hayes's discharge from the hospital Dr. Brennan felt that it was safe for Hayes to return to the Jail. The manner in which Dr. Brennan would communicate an inmate's status back to the referring institution would be to call the jail himself if he believed there was a high risk of harm or, if it was someone he felt was at a "very low or negligible risk," he would have a social worker contact the mental health liaison from the sending institution, which "was the case in this situation."  (Brennan Tr. at 10-11.)[3]

On July 23, 2002, upon returning to the Somerset County Jail from Spring Harbor, Joseph Hayes was assigned to D block. At some point after arriving back at the Somerset County Jail on July 23, 2002, Joseph Hayes was moved from D block to the holding cell area and placed in a holding cell by Sergeant Longhurst, the on-duty shift supervisor at the time of the move. (Defs.' SMF ¶ 22.)  Shift supervisors at the Somerset County Jail pass on information to on-coming shift supervisors in a log titled, "Somerset County Correctional Facility Briefing." The shift supervisor's briefing log notes that on July 23, 2002, Longhurst made the following entry:

---

[3]      Martin takes objection to these statements of fact because Dr. Brennan was never designated as an expert witness by the defendants and, therefore, should not be allowed to offer opinion testimony.  I sustain that objection as far as it goes to the witness's ability to offer expert testimony for the truth of the matter asserted and include these opinions only as relevant background to the ultimate fact that Brennan maintains he caused to be communicated to the jail the information that there was a very low or negligible risk of harm at the time of Hayes's return to the jail.

> Had Joseph Hayes in D-Blk inmates in D-Blk punching him and slapping him on back. Can't handle D-Blk due to stress. Put inmate Hayes out in drunk tank and put on close watch. I think came back too soon. (Giggey Aff. ¶ 17, Ex. 4.)

Protocol in the Somerset County Jail when an inmate is suspected of being suicidal calls for their movement to the intake area and crisis/mental health being contacted to come to the jail to evaluate the inmate's status and to determine if they need to be placed on suicide watch. (Defs.' SMF ¶ 24.) Inmates placed on suicide watch in the jail can be monitored in rotations from every fifteen-minutes down to one-on-one observation. (Defs.' SMF ¶ 25.)

The holding cell/intake area of the Somerset County Jail is the most visible location an inmate can be housed in at the jail. Placement in the holding cell area means that an inmate can be seen from the control room, seen on camera, and because corrections staff frequently are in and out of the holding cell area, inmates housed in that area are seen by corrections officers every time they go in and out of the holding cell area. (Def.'s SMF ¶ 40.) The holding cell to which Hayes was removed is positioned directly adjacent to the control room and is in direct view of the control officer. (Pl.'s SAMF ¶ 25.) The holding cell was used for inmates who were on suicide watch. (Id. ¶ 26.) The windows to the control room were equipped with one-way glass in order that control officers could view into the holding cell and other areas without inmates being able to see inside the control room. (Horton Aff. ¶ 27.) Inmates standing up close to the window, such as those waiting in line to be strip searched, can see into the control room. (Supp. Giggey Aff. ¶ 4.) A camera is located outside the holding cell and provides a direct view into the holding cell. This camera transferred visual images of the holding cell area to a monitor in the control room. (Pl.'s SAMF ¶ 28.) It was one of the many

duties of the control officer to monitor people in the holding cell, including those individuals who could be suicidal. (Id.)  The windows of the control room overlooking the holding cell area were also outfitted with shades that could be pulled down over the windows.  (Pl.'s SAMF ¶ 29.)  Since Hayes's suicide on July 27, 2002, the shades on the windows to the control room have been removed.  (Id. ¶ 30.)  On July 27 the shades to the window of the control room that faced the holding cell were drawn and in a downward position.  (Id. ¶ 31.)  The practice of the jail on July 27 required the shades to the control room be in the up position.  (Id. ¶ 32, Defs.' Resp. SAMF ¶ 32.)  That practice was necessary in order that the control officer could monitor inmates in the holding cell including those who could be suicidal.  (Pl.'s SAMF ¶ 33.)

The Somerset County Jail maintains a population log in the control room of the jail.  The log is titled, "Somerset County Jail Cell Block Assignments" and lists where the inmates are housed and also provides a notation pertaining to special needs/special management.  The notation contained in the Cell Block Assignment log is set forth in two places. The first place is next to the inmate's name on the cell block assignment and the second place is a separate category on page three.  (Defs.' SMF ¶ 29.)  The cell block assignment sheets are prepared by the control room officer each day at midnight, with the assistance of the shift supervisors, intake, and administration, and distributed to all officers who carry them throughout the day.  (Pl.'s Resp. SMF ¶ 29.) On July 23, 2002, a hand-written notation was made indicating that Hayes was moved from D block to the holding cell and Hayes was listed as being on close watch.  (Defs.' SMF ¶ 30.)  On July 24, 2002, page one of the cell block assignment lists Joseph Hayes in the holding cell, on close watch special management. On page three, Hayes is listed under the special

management category as suicidal. (Defs.' SMF ¶ 31.)  The same listing of Hayes as close watch special management on page one of the cell block assignments and as special management suicidal on page three of the cell block assignment is set forth on the Somerset County Jail cell block assignments from July 25 through July 27.  (Defs.' SMF ¶ 32.)

On July 27, 2002, Joseph Hayes was seen by the nurse at 8:00 a.m. medical pass, and there is no notation in Hayes's jail medical records to indicate that Hayes's status needed to be evaluated or that Hayes needed to be seen by crisis at that time. (Giggey Aff. ¶ 30, Ex. 6.)  The nurse, Stephen Foss, told the state police detective who interviewed him after the suicide that he had visual contact with Hayes on the day of his death, when he arrived to give him medication Hayes was on his bed and had to be called a couple of times, he took his medications and just stood there for a minute or two, but the two had absolutely no conversation.  (Det. Tripp Interview Tr., Exhibit 10.)

On that day Sergeant Fred Hartley began his shift as supervisor of the jail at 6:00 a.m. Hartley's shift was twelve hours, from 6:00 a.m. to 6:00 p.m.   (Pl.'s SAMF ¶ 34.) Officer Daniel Rivard was a corrections officer working the first deck (floor) of the jail. Rivard's shift was from 6:00 a.m. to 6:00 p.m.  (Id. ¶ 35.)  Officer John Davis was the control room officer on July 27, his shift beginning at 6:00 a.m. and lasting until 6:00 p.m. (Id. ¶ 36.)

Sometime during the early afternoon of July 27 Officer Davis reported that Joseph Hayes threw something against the window of the control room.  (Id. ¶ 37.)  Davis heard a bang hit the window.  (Id. ¶ 38.)  Davis did not know what hit the window as he was not able to view it through the monitor, and the shade of the control room was in a

downward position.  (Id. ¶ 39.)  Davis remembers pulling the shade to the side and
looking through to see that Hayes had gone back into the cell area around the corner
where it was difficult to see him.  (Id. ¶ 40.)  Davis claims he reported this incident to
Hartley.  (Id. ¶ 41.)  According to Hartley at no time on July 27 did Davis call Hartley
and tell him that Hayes was acting out in his cell.  (Id. ¶ 42.)   Jail records appear to
indicate that sometime after noon on July 27 Hartley was in the holding cell talking with
Hayes.  (Id. ¶ 43.)  During that afternoon four corrections officers were working the first
floor of the jail: Rivard, Hartley, Horton, and Davis.  (Id. ¶ 44; Defs.' Resp. SAMF ¶ 44.)

    Although Hartley has no memory of the incident, Officer Elizabeth Horton recalls
that at approximately 3:30 p.m. she asked Hartley to come to the lobby.  Horton was a
corrections officer at the jail on duty on July 27 and assigned to monitor activities in the
visitation room.  According to her Hartley went to the jail lobby and confronted Julian
Martin, the stepfather of Joseph Hayes.   Martin had arrived at the jail in order to visit
Joseph Hayes.  Hartley told Martin that Hayes could not be visited because Hayes had
been moved into the holding cell.  Martin insisted he wanted to meet with his stepson.
After a discussion lasting a few minutes Hartley told Martin he would allow a visit with
Hayes in the noncontact visitation room.  Horton describes Hartley's behavior as
inappropriate and unnecessarily rude to Martin.  Following the exchange Hartley left the
visitation room to get Hayes; Horton entered the visitation room to supervise the inmates
and their visitors.  Sometime after visitation commenced Horton heard yelling on the
radio and she recognized Hartley's voice.  Horton could not understand what was being
said.  Hartley then radioed to her and told her to shut down the visits.  The inmates and
visitors became disruptive when told that visitation would be shut down.  Horton then

attempted to contact Hartley on the radio to find out what the problem might be. Hartley, once alerted to opposition voiced by inmates and visitors, told Horton to continue the visitation. When visitation ended Horton went into the control room. She noticed people gathered in the holding cell and could see into the holding cell through the window because the shade was raised. She then learned of Hayes's death. Hartley and Horton next had a conversation about Horton's need to remain on duty and monitor inmates in the mess hall. (Pl.'s SAMF ¶¶ 44 – 63; Defs.' Resp. SAMF, ¶¶ 44- 62.) Horton remembers that Hartley gave her conflicting instructions requiring her to monitor inmates at two different locations at the same time and flew into a rage. (Pl.'s SAMF ¶ 63.) In any event it is undisputed that following this incident Horton wrote a three-page letter to Lieutenant Craft in which she complained about Hartley's lack of professionalism and rude conduct. (Pl.'s SAMF ¶ 64.)

Hartley does admit that he was going to get Hayes for a visitation when he discovered him hanging by a sheet in the cell. (Defs.' Resp. SAMF ¶ 51.) According to Hartley's own notes at no time between 2:30 p.m. until he discovered Hayes hanging at 3:43 p.m. did Hartley speak with Hayes. (Pl.'s SAMF ¶ 65.) On finding Hayes hanging, Hartley called to Officer Rivard to assist him in the holding cell. Rivard arrived in the holding cell to find Hartley holding Hayes up. One end of the sheet was tied to Hayes's neck and the other to the metal bar on the window. (Id. ¶ 67.) Rivard tried to cut the blanket with a seat belt cutter and when that proved unsuccessful he returned to his office and found a pair of scissors which he used to cut the blanket, holding Hayes in order to be able to lower Hayes to the ground. (Id. ¶¶ 68-69.)

Hayes was not "dead weight" as he was lowered to the ground.  (Id. ¶ 70.)
Hartley was not sure whether Hayes was breathing or not, but he felt like Hayes was
breathing.  Furthermore, when the medical personnel left with Hayes he was breathing.
(Defs.' Resp. SAMF ¶ 71.)  Neither Hartley nor Davis attempted to resuscitate Hayes's
breathing.  Instead they waited for medical personnel.  (Pl.'s SAMF ¶ 72.)  The
ambulance arrived at the jail at 3:50 p.m.  Upon arrival of medical personnel, Hayes was
placed in an ambulance and transported to the hospital.  Rivard accompanied him.  (Id.
¶ 73.)  Hayes died at approximately 4:29 p.m. on July 27.  (Id. ¶ 76.)

As a result of the suicide of Joseph Hayes, The State of Maine, Department of
Corrections conducted its own investigation in which it made findings of fact and notified
the jail of its failure to follow certain procedures and its need to remedy the same.  (Id.
¶ 77.)  Nichols, the department's investigator, determined that the jail and its staff failed
to conduct fifteen minute supervision checks upon Hayes or failed to record any such
monitoring in the intake log.  (Id. ¶ 79; Defs.' Resp. SAMF ¶ 79.)  Nichols further found
that a review of the jail logs on July 27, 2002, indicated that Hayes was last checked by
jail staff at 1:04 p.m. and that nothing further was recorded in the jail log until Hayes was
found hanging in the holding cell two hours and thirty-nine minutes later, at 3:43 p.m.
Nichols informed the jail administrator, Giggey, of this violation.  (Pl.'s SAMF ¶ 80.)
Nichols further found that the jail and its staff failed to appropriately monitor Hayes as a
special management inmate or appropriately document the reasons and justifications for
Hayes being segregated in the holding cell. Nichols added that jail staff also failed to
reevaluate Hayes (every four hours as required by jail protocol) and determine whether or
not segregation was still justified.  (Id. ¶ 81.)  Nichols made further findings that Hayes

had been placed in the holding cell for an inappropriate length of time. The Somerset County Jail holding area is rated as a six-hour holding area; Hayes was housed in the holding cell area for four days.  (Id. ¶ 82.)  Nichols also made findings that the shade of the control room window had been pulled down and that the control room officer was not able to observe or be aware of Hayes's activity or even that he had committed suicide. (Id. ¶ 82.)  Based on all these findings Nichols instructed Delong to take corrective action and bring these areas into compliance.  He indicated that he would visit the jail in the future to ensure that proper measures were taken. (Id. ¶ 83.)

***Defense Disputed Evidence Regarding What the Jail Officials Knew or Believed***

In the time period extending from July 23 until July 27, 2002, it was communicated to the jail's medical department that Hayes had been cleared off suicide watch and this information was provided to jail staff. (Giggey Aff. ¶ 15; Bugbee Aff. ¶ 4; Hartley Aff. ¶ 4; Davis Aff. ¶ 4; Rivard Aff. ¶ 3.)  On July 23, 2002, Sergeant Longhurst did not contact crisis/mental health to come in to evaluate Joseph Hayes when Hayes was moved from D Block down to the holding cell area of the jail. (Giggey Aff. ¶ 20.) Longhurst noted in the briefing log entry immediately after the notation pertaining to Joseph Hayes that another inmate was in need of seeing crisis and crisis had been called in to see the other inmate. (Giggey Aff. ¶ 21.)   The information that was communicated to staff coming on duty between July 23 and July 27 was that Hayes had been cleared off suicide watch by Spring Harbor and that he had been moved down from D block to the holding cell area of the jail because of the problems he was having coping with being around other inmates. (Giggey Aff. ¶ 22; Bugbee Aff. ¶ 8; Hartley Aff. ¶¶ 6-7.)  Hartley has no recollection of having seen the roster listed this way during the time period in

question; however, had he seen this notation, he would have believed it to have been a typographical error or a mistake. The reason this is so was that Hayes had been moved to the holding cell, no one had contacted crisis or mental health to re-evaluate Hayes's status, corrections officers cannot determine the inmate to be suicidal, and the suicide protocol had not been initiated for Hayes. If Hartley did see or had seen the roster notation that Hayes was suicidal, he would have believed that someone had looked back at the roster for the time period between July 17 and July 20, saw that Hayes was listed as suicidal, and carried that designation forward by mistake. (Defs.' SMF ¶ 33, missing record citation.) One of the things done by shift supervisors at the Somerset County Jail at the start of their shift is to talk with any special management inmates to determine if there is any change in status. (Giggey Aff. ¶ 27; Bugbee Aff. ¶ 6; Hartley Aff. ¶ 12.)

Between July 23 and July 27 there are no notations in the shift supervisor's pass on log indicating that Joseph Hayes had expressed any suicidal ideation or that his behavior caused concern, nor is there any record that crisis intervention was contacted to speak with Joseph Hayes between July 23, 2002, and July 27, 2002. (Giggey Aff. ¶ 28.) As part of the Somerset County Jail's suicide prevention protocol, inmates are placed in a holding cell, stripped of their clothes, given a suicide blanket, and not given normal eating utensils. Between July 23 and July 27 the suicide protocol was not started with respect to Joseph Hayes. (Giggey Aff. ¶ 29; Hartley Aff. ¶ 10.) Shift supervisors, including Hartley and Darlena Bugbee questioned Hayes at the start of their shifts, and he told them he was doing fine, and that he preferred to be away from the population. (Bugbee Aff. ¶¶ 6-7; Hartley Aff. ¶¶ 13-15.)

On July 27 Sergeant Hartley went in and spoke with Hayes at the start of his shift. It was Hartley's impression from speaking with Hayes that Hayes was doing fine. (Hartley Aff. ¶ 15.)  During the time period immediately preceding Hayes's suicide Hartley had been in and out of the holding cell as he was storing inmates there who were waiting to be strip searched after contact visits. Every time Hartley would open the door of the holding cell area, Hayes would be viewed, as his cell location was directly in front of Hartley, and it was unavoidable to not see Hayes. On each trip into the holding cell area Hartley did not see Hayes preparing to attempt suicide or otherwise see any indication that Hayes was about to attempt suicide. (Id. ¶¶ 16-18 .)  Hartley had last been in the holding cell area at around 15:33 (3:34 p.m.) in the process of conducting strip searches for inmates returning from visits. This information is set forth in the control room log and was logged contemporaneously by patrol room officer John Davis based upon his observations of Hartley's activities. (Giggey Aff. ¶ 34; Hartley Aff. ¶ 17, Ex. 7.) Hartley did not believe Joseph Hayes to be a suicide risk on July 27. (Hartley Aff.  ¶¶ 7-11, 19, 46.)  Daniel Rivard, who had little to no contact with Hayes on the date of his suicide, did not believe Joseph Hayes to be a suicide risk on July 27. (Rivard Aff. ¶ 7.) John Davis did not believe Joseph Hayes to be a suicide risk on July 27. (Davis Aff. ¶ 7.)

Although the daily rosters for July 24 to July 27 contained the notation that Hayes was "close watch" or "special management – suicidal" the rosters can contain errors in classification, such as was the case with Joseph Hayes, where, after his placement in the holding on July 23, someone appears to have incorrectly carried over information pertaining to the suicide assessment done on Hayes prior to his being sent to Spring Harbor Hospital.  (Supplemental Giggey Aff. ¶ 3.)

*Plaintiff's Disputed Evidence Regarding What the Jail Officials Knew or Believed*

Martin stresses that according to the Somerset County Jail Cell Block Assignments Hayes remained under close observation/suicidal in the holding cell until his death on July 27.  (Pl.'s SAMF ¶ 20.)  With the exception of July 23, from July 17 to his death on July 27, Hayes was listed on the cell block assignments as "close watch" and "special management – suicidal."  (Id. ¶ 21; Defs.' Resp. SMF ¶ 21.)  These cell block assignment sheets, known as rosters, are kept in the sergeant's office, in the booking room, and in the control room.  There is also a second floor roster, containing only the names of inmates on the second floor, which is kept on the second floor.  Officers, if they would like to carry with them an inmate roster while they work, can, on their own initiative, make a copy of the inmate roster in the sergeant's office and do so.  It is not, however, a requirement that they do so.  (Supplemental Giggey Aff. ¶ 2; Horton Aff. ¶ 28.)  These rosters were generally considered accurate in their information and officers relied upon them.  (Pl.'s SAMF ¶ 23.)

### *Disposition*

In a nutshell, the defendants argue:

> In the present case Defendants Hartley, Davis and Rivard did not know that Joseph Hayes was suicidal. It had been communicated to them that Hayes had been cleared off suicide watch while at Spring Harbor. There was no indication that crisis, medical staff or a mental health worker had evaluated Hayes and assessed him as a suicide risk subsequent to the return from Spring Harbor. Furthermore, the supervisor for their shift, Sgt. Hartley, was advised that Hayes had been moved down because of problems he was having with other inmates. Hartley did not receive additional information that Hayes was manifesting suicidal ideation either at pass on or by observation. Thus, with the information Hartley had, he knew Hayes was not on suicide watch, and did not advise Davis and Rivard that Hayes was on suicide watch.

(Summ. J. Mem. at 10.)

 In response, Martin argues:

> Evidence on the record shows that Somerset County and Sheriff Delong
> had policies, procedures and the like regarding proper care and protocol of
> suicidal inmates; that such policies required close watch of suicidal
> inmates; that the jail and its officers knew Hayes to be suicidal; and that
> the jail and its officers were deliberately indifferent to the suicide risk that
> Joseph Hayes posed to himself. Evidence on the record also supports
> claims against supervising officer Sergeant Hartley, and corrections
> officers John Davis and Daniel Rivard arising from their knowledge of
> Joseph Hayes'[s] suicidal tendencies and their deliberate indifference to
> safeguard his well-being ignoring the risk of suicide that he posed to
> himself. Evidence also supports claims, individually, against Sergeant
> Hartley and Officers Davis and Rivard arising from their negligent acts
> and omissions and the absence of fulfilling a discretionary function.

(Mem. Opp'n Summ. J. at 1-2.)

### *Eighth Amendment Deliberate Indifference Standard*

> [A] prison official cannot be found liable under the Eighth Amendment for
> denying an inmate humane conditions of confinement unless the official
> knows of and disregards an excessive risk to inmate health and safety; the
> official must both be aware of facts from which the inference could be
> drawn that a substantial risk of serious harm exists, and he must also draw
> the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994).[4]

 There is no dispute, nor should there be, see, e.g., Matos ex rel. Matos v.

O'Sullivan, 335 F.3d 553, 557 (7th Cir. 2003); Hott v. Hennepin County, Minnesota, 260

F.3d 901, 907 (8th Cir. 2001) ("That the harm of suicide is a serious one is a foregone

conclusion"), that suicide is a serious harm under Farmer. Accordingly, the task falls to

---

[4]  Hayes began the relevant stretch of residency in the jail as a pre-trial detainee and ended it as a
sentenced inmate. However, the Farmer deliberate indifference standard applies to his care in either status.
See Brown v. Harris, 240 F.3d 383, 389 & n.6 (4th Cir. 2001) (collecting cases); Jacobs v. West Feliciana
Sheriff's Dept., 228 F.3d 388, 393 (5th Cir. 2000); but see Snow v. City of Citronelle, __ F.3d __, 2005 WL
1950283, * 5(11th Cir. Aug. 16, 2005) ( applying a deliberate indifference standard to pre-trial detainee
claim of this ilk, distinguishing it from Eighth Amendment claims by convicted prisoners, and not citing
Farmer); Woloszyn v. County of Lawrence, 396 F.3d 314, 321 (3d Cir. 2005) (pondering the difference
between the Eighth and Fourteenth Amendment deliberate indifference standards).

Martin to create a genuine dispute of fact that each individual defendant subjectively knew that Hayes "was at substantial risk of committing suicide <u>and</u> that [one or more] individual defendant intentionally disregarded that risk." <u>Matos ex rel. Matos</u>, 335 F.3d at 557.  This "requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm."  <u>Id.</u>

It is fair to infer that corrections officers on duty between July 17 and July 19, were aware that Hayes was kept in the holding cell area those two days and was on "close watch."  They might also be aware that on July 19 Kennebec Somerset Crisis Response Services was called back to the jail to evaluate Hayes a second time.  The record indicates that Hayes reported during the evaluation that he had attempted to hang himself with a blanket the previous night and that he did not want to return to general population, that he gets suicidal when stressed out, and that returning to the jail population stresses him out.  Hayes said that his "nerves were shot." Hayes also said at this juncture that it was "better to be dead than alive" and that his suicide attempt had been interrupted by a loud noise. While it is possible that jail personnel were told of the logistics of Hayes's suicide efforts, including that he readied bedding, there is no evidence that any of the individual defendants were privy to the description of Hayes's state of mind tendered to the crisis counselor.

Jail personnel would know that on July 20 Hayes was transferred to Spring Harbor Hospital because he was suicidal and that Hayes was at Spring Harbor from July 21 to July 23, 2002.  Doctor Brennan met with Hayes on July 23, 2002, and discussed Hayes's return to the Somerset County Jail and at the time of Hayes's discharge from the hospital Dr. Brennan felt that it was safe for Hayes to return to the Jail. As evidence that

Hayes was a "very low or negligible risk," Brennan had a social worker contact the mental health liaison from the jail.  However, again, there is no evidence that the individual defendants were apprised of the details of Brennan's determination.

It is fair to infer that corrections officers on duty after Hayes's return to the jail would be aware of the following.  On the very day he returned to the jail Hayes was moved from D block to the holding cell area and placed in a holding cell by Sergeant Longhurst, who indicated that inmates in D block were punching him and slapping him on back and that Hayes could not handle D block due to stress. Longhurst put Hayes on close watch and indicated that he thought Hayes had come back to the jail too soon. Longhurst did not contact crisis/mental health to come in to evaluate Hayes when Hayes was moved from D Block down to the holding cell area of the jail although he made another notation that a different inmate was in need of seeing crisis and crisis had been called in to see the other inmate.  (One might infer that Longhurst, who is not a defendant, did not believe that another evaluation of Hayes on the same day he was returned to the jail would further things along.)

The holding cell to which Hayes was removed is positioned directly adjacent to the control room and is in direct view of the control officer and was used for inmates who were on suicide watch.   On July 24 page one of the cell block assignment lists Hayes in the holding cell, on close watch special management and on page three, Hayes is listed under the special management category as suicidal.  The same listing of Hayes as close watch special management on page one of the cell block assignments and as special management suicidal on page three of the cell block assignments is set forth on the Somerset County Jail cell block assignments from July 25 through July 27.  From these

facts it is a fair inference that a determination was made by correctional personnel (just who we do not know from this record) that Hayes should be in direct view and should be monitored for suicide.  Hartley pleads a lack of recollection about Hayes's roster listing and asserts that had he seen this notation, he would have believed it to have been a typographical error or a mistake because no one had contacted crisis or mental health to re-evaluate Hayes's status, correctional officers cannot determine the inmate to be suicidal, and the suicide protocol had not been initiated for Hayes.  He claims that on July 27 he went in and spoke with Hayes at the start of his shift and that Hayes was doing fine. On each trip into the holding cell area on July 27  Hartley did not see Hayes preparing to attempt suicide or otherwise see any indication that Hayes was about to attempt suicide.[5] It is a fair inference from the fact that Hartley was the shift supervisor and from his assertions about how he was able to keep tabs on Hayes, that he had been assigned or had assumed this responsibility (at least in part).   Thus, at least on the day of Hayes's suicide, Crisis would only be called and the further suicide protocols initiated if Harley took some steps to do so.

Davis was the control room officer on July 27 and it was his duty to monitor people in the holding cell, including those individuals who could be suicidal. On July 27 the shades to the window of the control room that faced the holding cell were drawn and in a downward position although the practice of the jail on July 27 required the shades to the control room be in the up position.  Since Hayes's suicide on July 27, the shades on the windows to the control room have been removed. Davis reported that Hayes threw something against the window of the control room and Davis heard a bang.  Davis did not

---

[5]     Martin has provided video tapes and some stills of the holding cell area.  However, in its current format it is hard to make head or tail of what they demonstrate apropos Hartley's ability to monitor Hayes. If presented in an intelligible fashion they may very well support Martin's case.

know what hit the window as he was not able to view it through the monitor and the shade of the control room was in a downward position. (It remains a mystery what Hayes threw.)  Davis claims he reported this incident to Hartley but Hartley reports that at no time on July 27 did Davis call Hartley and tell him that Hayes was acting out in his cell although jail records appear to indicate that sometime after noon on July 27 Hartley was in the holding cell talking with Hayes.  Hartley's own notes show that at no time between 2:30 p.m. until he discovered Hayes hanging at 3:43 p.m. did Hartley speak with Hayes, although he was in the holding cell area at 3:34 conducting strip searches.   Horton describes Hartley's behavior in his meeting with Hayes's stepfather as inappropriate and unnecessarily rude to Martin.

The Department of Corrections' own investigation reports that the jail failed to follow certain procedures.  It determined that the jail and its staff failed to conduct fifteen minute supervision checks upon Hayes or failed to record this monitoring in the intake log.  It further found that a review of the jail logs on July 27 indicated that Hayes was last checked by jail staff at 1:04 p.m. and that nothing further was recorded in the jail log until Hayes was found hanging in the holding cell two hours and thirty-nine minutes later. And the report found that the jail and its staff failed to appropriately monitor Hayes as a special management inmate or appropriately document the reasons and justifications for Hayes being segregated in the holding cell.  It added that jail staff also failed to reevaluate Hayes and determine whether or not segregation was still justified and that Hayes had been placed in the holding cell for an inappropriate length of time by being placed in a holding area rated as a six-hour holding area for four days.  Nichols also made findings that the shade of the control room window had been pulled down and that

the control room officer was not able to observe or be aware of Hayes's activity or even that he had committed suicide.

The First Circuit Court of Appeals does not have a post-Farmer deliberate indifference jail or prison suicide precedent. However, there are numerous cases from other Circuits that discuss such claims at great lengths. The variants in facts from case to case when viewed through the often difficult to handle subjective component of the deliberate indifference analysis apropos prison/jail suicides make these precedents difficult to apply to the record before me.

### Deliberate Indifference Claims against Hartley and Davis

Although the call is a close one, in my view this record is closer to those cases that council allowing the jury to make the determination as to Hartley's and Davis's subjective state of mind as to the question of whether they knew Hayes was a suicidal risk on July 27 and, if so, whether they unreasonably disregarded that risk. See Snow v. City of Citronelle, __ F.3d __, 2005 WL 1950283, * 6-7 (11th Cir. Aug. 16, 2005); Turney v. Waterbury, 375 F.3d 756, 760 -61 (8th Cir. 2004) (reversing the grant of summary judgment as to one defendant and affirming as to two lesser-involved, less-responsible defendants); Coleman v. Parkman, 349 F.3d 534, 539 (8th Cir. 2003); Olson v. Bloomberg, 339 F.3d 730, 735 -738 (8th Cir. 2003); Cavalieri v. Shepard, 321 F.3d 616, 620 -22 (7th Cir. 2003); Comstock v. McCrary, 273 F.3d 693, 704 -11 (6th Cir. 2001); Sanville v. McCaughtry, 266 F.3d 724, 737 -39 (7th Cir. 2001); Jacobs v. West Feliciana Sheriff's Dept., 228 F.3d 388, 394-98 (5th Cir. 2000)(affirming denial of summary judgment as to two defendants but concluding that the denial of summary judgment on qualified immunity grounds was improper as to a third); compare Gray v.

<u>City of Detroit</u>, 399 F.3d 612, 616 (6th Cir. 2005); <u>Woloszyn v. County of Lawrence</u>, 396

F.3d 314, 322 -23 (3d Cir. 2005); <u>Cagle v. Sutherland</u>, 334 F.3d 980, 989 -90 (11th Cir.

2003); <u>Brown v. Harris</u>, 240 F.3d 383, 389 -91 (4th Cir. 2001) (affirming grant of motion

for judgment as a matter of law, noting that, even if the correctional officers had

knowledge that the inmate posed a potential suicide risk, they did not disregard an

excessive risk to the inmate's health or safety because they responded reasonably to the

risk that they knew); <u>Gregoire v. Class</u>, 236 F.3d 413, 418 -19 (8th Cir. 2000) (reversing

the denial of qualified immunity, noting that the defendants may not have done all that

they could have to prevent the inmate's suicide but concluding that they were " at most

negligent" not deliberately indifferent); <u>Yellow Horse v. Pennington County</u>, 225 F.3d

923, 928 (8th Cir. 2000) (concluding that the District Court did not err in granting

summary judgment on qualified immunity grounds because the record did not indicate

that the defendants knew of and disregarded an excessive risk to the inmate's health).

In answering Martin's complaint the defendants asserted a qualified immunity

defense.  The defendants did not press qualified immunity as grounds for granting

summary judgment, although Martin's responsive memorandum does address the

question.

Per the First Circuit Court of Appeals' instructions,

this circuit usually evaluates qualified immunity claims under a three-part
test. <u>See</u>, <u>e.g.</u>, <u>Riverdale Mills Corp. v. Pimpare</u>, 392 F.3d 55, 60-61 (1st
Cir.2004). The first part of the test asks: "Taken in the light most favorable
to the party asserting the injury, do the facts alleged show the officer's
conduct violated a constitutional right?" <u>Id.</u> at 61 (internal quotation marks
omitted). In the second stage, the question is "whether the right was
clearly established at the time of the alleged violation such that a
reasonable officer would be on notice that his conduct was unlawful." <u>Id.</u>
(internal quotation marks and alteration omitted). And in the last stage, we
ask "whether a reasonable officer, similarly situated, would understand

that the challenged conduct violated the clearly established right at issue."
Id. (internal quotation marks omitted).

Torres Rivera v. Calderon Serra, 412 F.3d 205, 214 (1st Cir. 2005). With respect to

Hartley and Davis, I have already determined that Martin's yet-unproven facts state a

claim for an Eighth Amendment violation.  Compare id.  There is no need to revisit the

cases cited above; there is no doubt that at the time of Hayes's suicide a reasonable officer

would have been on notice that being deliberately indifferent to a known risk that an

inmate was suicidal would violate that inmate's constitutional rights.  And, finally, once

again drawing all reasonable inferences in Martin's favor on the record before me, a

reasonable officer situated similarly to Hartley and/or Davis during the events in question

would understand that their conduct violated Hayes's rights.  Once a plaintiff creates a

genuine dispute of material fact that a defendant was subjectively deliberately indifferent,

compare Carter v. Galloway, 352 F.3d 1346, 1349-50 (11th Cir. 2003), then the

defendant cannot be entitled to qualified immunity on the grounds that a reasonable

officer in his or her position would not understand that such conduct violated the

plaintiff's rights.  See Walker v. Benjamin, 293 F.3d 1030, 1040-41 (7th Cir. 2002);

Ziccardi v. City of Philadelphia, 288 F.3d 57, 63-64 (3d Cir. 2002); Thompson v. Upshur

County, 245 F.3d 447, 463-64 (5th Cir. 2001); see also Estate of Ford v. Ramirez-

Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002) (observing that "Eighth Amendment claims

depend in part on a subjective test that does not fit easily with the qualified immunity

inquiry); Gregoire, 236 F.3d at 418 n.3 (recognizing "some tension between the

subjective component of the deliberate indifference standard created in Farmer, and the

Supreme Court's abandonment of a subjective malice component in qualified immunity

determinations"); Jacobs, 228 F.3d at 397 ("Sheriff Daniel knew that Jacobs exhibited a

24

serious risk of suicide and placed her in conditions he knew to be obviously inadequate.
He then ordered, without reasonable justification, that she have a blanket and towel, even
though he knew that those items should not be in the hands of a seriously suicidal
detainee. We would find it difficult to say that this behavior could not support a jury
finding that Sheriff Daniels acted with deliberate indifference, and likewise we find it
even more difficult to say that this conduct was objectively reasonable.").

### *Deliberate Indifference Claims against Frederick Hartley, John Davis, and Daniel Rivard for Post-Hanging Conduct*

First, the only possible basis for holding Daniel Rivard liable under 42 U.S.C.
§ 1983 would be his part in the post-hanging discovery and treatment of Hayes.  The
facts pertaining to Rivard on this score are that he was called by Hartley to assist him
once Hayes was discovered, Rivard went to the control room and picked up seat belt
cutters, returned to the holding sell and could not cut the sheet using the cutters, returned
to the sergeant's office and got a pair of scissors, and returned to the cell and was able to
cut the sheet with the scissors.  (Pl.'s SAMF ¶¶ 67-69.) There is nothing in these facts that
begins to state a claim against Rivard.

Martin principally faults Hartley, Rivard and Davis for not attempting to
resuscitate Hayes prior to the arrival of the ambulance.  (Id. ¶ 73.)  According to Martin,
Hartley entered Hayes's holding cell at approximately 3:43 p.m. and the ambulance
arrived at 3:50 p.m.  (Id. ¶¶ 66, 73.) Neither party pinpoints when in this seven-minute
time frame Rivard succeeded in cutting the sheet.  When Hayes was lowered he was not
dead-weight.  (Id. ¶ 70.)  Hartley detected a pulse.  He reports that he was not sure
whether Hayes was breathing or not but that he felt as though he was and Hayes was
breathing when he left in the ambulance. (Id. ¶¶ 71, 72; Defs.' Resp. Pl.'s SAMF ¶¶ 71,

72.)  There is no evidence that the emergency responders had to take any measures apropos Hayes's breathing prior to transporting him.  I do not believe that Martin has created a genuine dispute of material fact vis-à-vis Hayes's, Rivard's and Davis's conduct after the discovery of Hayes to support a deliberate indifference claim.  See Clinton v. County of York, 893 F.Supp. 581, 586 -87 (D.S.C. 1995) (no Farmer deliberate indifference when officers immediately cut inmate's body down and laid him on the mattress pad in the cell, noting that there were no allegations that officers acted with any ill will towards the inmate, observing that their failure to perform CPR was, at most, negligence)(footnote omitted); compare Heflin v. Stewart County, 958 F.2d 709, 713 (6th Cir. 1992) (defendant officers left inmate hanging for twenty minutes or more after discovering him even though the body was warm and his feet were touching the floor and prevented other personnel from assisting).

### *Deliberate Indifference Claims against Sheriff Delong*

There is no evidence that Sheriff Delong had any personal involvement in Hayes's care during his incarceration. A supervisory officer may be held liable for the behavior of his subordinate officers where his "action or inaction [is] affirmative[ly] link[ed] ... to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence amounting to deliberate indifference.'" Lipsett v. University of P.R., 864 F.2d 881, 902 (1st Cir.1988) (internal citation omitted); accord Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002). The "affirmative link" requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation. Hegarty v. Somerset County, 53 F.3d 1367, 1379 -80 (1st Cir. 1995).  There is no evidence in this record that Delong authorized, approved, or

knowingly acquiesced in the alleged unconstitutional conduct of Hartley and Davis.  See
Comstock v. McCrary, 273 F.3d at  712 -13 .  Indeed the evidence is that he had a suicide
policy in place and that the protocols were followed with respect to Hayes when he was
first evaluated.   In her own factual statements and responsive memorandum Martin
faults Hartley and Davis for not following the proper protocols and keeping Hayes on
close watch.  (See Pl.'s SAMF ¶¶ 29-33, 39, 77-83;  Pl.'s Resp. SMF ¶¶ 24, 47; Pl.'s
Mem. Resp. Summ. J. at 17-18.)

### Deliberate Indifference Claims against Somerset County

> In Monell v. N.Y. City Dept. of Social Servs., 436 U.S. 658
> (1978), the Supreme Court established both the fact that "municipalities
> and other local government units [were] included among those persons to
> whom § 1983 applies," id. at 690, and the limits of such actions. Most
> importantly, Monell held that "a municipality cannot be held liable under
> § 1983 on a respondeat superior theory." Id. at 691. Instead, municipal
> liability exists only "when execution of a government's policy or custom,
> whether made by its lawmakers or by those whose edicts or acts may
> fairly be said to represent official policy, inflicts the injury." Id. at 694.
> We have identified three different ways in which a municipality or other
> local governmental unit might violate § 1983:(1) through an express
> policy that, when enforced, causes a constitutional deprivation; (2)
> through a "wide-spread practice" that although not authorized by written
> law and express policy, is so permanent and well-settled as to constitute a
> "custom or usage" with the force of law; or (3) through an allegation that
> the constitutional injury was caused by a person with "final decision
> policymaking authority." McTigue v. City of Chi., 60 F.3d 381, 382 (7th
> Cir.1995).

Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005).

Once again I note that the evidence is that Delong had a suicide policy in place
and that the protocols were followed with respect to Hayes when he was first evaluated.
Again I note, Martin is faulting Hartley and Davis for not following the proper protocols
and keeping Hayes on close watch.  Martin has not created a genuine dispute of fact to
advance with a claim against Somerset County on any one of the three forms of

27

municipal liability. See  Snow, __ F.3d  at __, 2005 WL 1950283, * 7-8; Bradich ex rel. Estate of Bradich v. City of Chicago, 413 F.3d 688, 690 (7th Cir. 2005); Turney v. Waterbury, 375 F.3d 756, 761 -62 (8th Cir. 2004).

### Maine Tort Claims Act and Wrongful Death Counts

There is no dispute that Somerset County is a named member of the Maine County Commissioners Association Self-Funded Risk Management Pool ("MCCA"), and coverage is provided through a Coverage Document issued to each of the member counties. The MCCA provides Somerset County with a separate Member Coverage Certificate covering the period extending from January 1, 2002, through December 31, 2002, which states the limits of liability under the Coverage Document with respect to causes of action seeking tort damages. This Certificate includes affirmative language limiting the insurance-type coverage under the MCCA Coverage Document to those claims for which immunity is waived under the Maine Tort Claims Act.  (Defs.' SMF ¶ 48.)   Other than the insurance-type coverage provided to Somerset County under the MCCA Coverage Document, Somerset County has procured no insurance against liability of any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. (Id. ¶ 49.)

Martin concedes that Section 8111 of title Fourteen of the Maine Revised Statutes provides immunity to employees when performing "any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid." 14 M.R.S.A. § 8111(1)(C). Her argument is that because

Hartley, Davis, and Rivard did not follow the proper suicide protocols their actions or

inactions that day were not discretionary.

      With respect to the discretionary function analysis, the Maine Law Court

explains:

>       We have identified four factors to help determine whether
> discretionary function immunity shields a governmental employee from
> tort liability:
>       (1) Does the challenged act, omission, or decision <u>necessarily
> involve a basic governmental policy, program, or objective</u>?
>       (2) Is the questioned act, omission, or decision <u>essential to the
> realization or accomplishment of that policy, program, or objective</u>
> (as opposed to one that would not change the course or direction of
> the policy, program, or objective)?
>       (3) Does the act, omission, or decision <u>require the exercise of basic
> policy evaluation, judgment, and expertise</u> on the part of the
> governmental employee involved?
>       (4) Does the governmental employee involved <u>possess the requisite
> constitutional, statutory, or lawful authority and duty</u> to do or make
> the challenged act, omission, or decision?
> <u>See</u> <u>Roberts v. State</u>, 1999 ME 89, ¶ 8, 731 A.2d 855, 857; <u>Grossman [v.
> Richards]</u>, 1999 ME 9, ¶ 7, 722 A.2d [371,] 374.

<u>Carroll v. City of Portland</u>, 1999 ME 131, ¶ 7, 736 A.2d 279, 282- 83.  "Relying on the

four factors, without going through them in detail, the Maine Court held, 'in <u>Erskine</u>

<u>v. Commissioner of Corrections</u>, 682 A.2d [681,] 686 [(Me. 1996)], that '[t]he

management and care of prisoners is a discretionary function.'" <u>Roberts</u>, 199 ME at ¶ 9,

731 A.2d at 57.

      In <u>Richards v. Town of Eliot</u>, 780 A.2d 281 (Me. 2001) the Maine Law Court

concluded in an excessive force case that the objectively reasonable inquiry apropos the

assertion of a qualified immunity defense to a 42 U.S.C. § 1983 claim was the equivalent

of the absolute immunity scope of discretion inquiry with respect to a claim under the

Maine Tort Claims Act.  <u>Id.</u> at 292-93; <u>see</u> <u>also</u> <u>Comfort v. Town of Pittsfield</u>, 924

F.Supp. 1219, 1236 (D.Me.1996).   I think the same must hold true for deliberate indifferent claims; if a defendant is denied qualified immunity on a 42 U.S.C. §1983 claim because there is a genuine dispute of material fact as to whether he or she had a culpable state of mind under the Eighth Amendment then he or she is not entitled to summary judgment on a Maine Tort Claims Act claim by dint of an absolute immunity defense that he was acting within the scope of his or her discretion.

With respect to Sheriff Delong in his individual capacity as a supervisor, "[W]hile the supervision of prison inmates has been held to constitute a discretionary task for purposes of the MTCA, 'egregious' abuse of discretion vitiates the protections of section 8111(C)." Estate of Hampton v. Androscoggin County, 245 F.Supp.2d 150, 161 (D. Me. 2003).  However, as in Estate of Hampton, "[t]he fly in the ointment for" in this case Martin, "is (again) a lack of evidence from which a reasonable trier of fact could conclude that personally," in this case Delong, "egregiously abused the discretion afforded him." Id.

### *Conclusion*

For the reason stated, I recommend that the Court **DENY** the motion for summary judgment as to the deliberate indifference claims and state law tort claims against Frederick Hartley and John Davis for their pre-hanging conduct.  I further recommend that the Court **DISMISS** the count under the American's with Disability Act and the state law claims against Somerset County and Sheriff Delong in his official capacity because Martin has consented to this dismissal.  Finally, I recommend that the Court **GRANT** the summary judgment motion on the deliberate indifference claims against Daniel Rivard,

Sheriff Delong, and Somerset County, as well as the Maine Tort Claims Act and

wrongful death counts against Rivard and Delong, in their individual capacities.


NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive
memorandum shall be filed within ten (10) days after the filing of the
objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.


August 26, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge